FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 24 2009

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

SIERRA CLUB and WYOMING )
OUTDOOR COUNCIL, )
                                   )
      Plaintiffs, )
                                   )
v. )    No. 07-CV-42-J
                                   )
PACIFICORP, )
                                   )
      Defendant. )

## ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT TO ESTABLISH PLAINTIFFS' STANDING

The plaintiffs' Motion for Partial Summary Judgment and Supporting Memorandum to Establish Plaintiffs' Standing (Docket Entry 31), the Defendant's opposition thereto (Docket Entry 41), and the plaintiffs' further reply (Docket Entry 47) have come before the Court for consideration. The Court, having considered the parties' written submissions and the materials provided in support of their respective positions, all pleadings of record, the applicable law, and being fully advised, FINDS and ORDERS that the plaintiffs' Motion for Partial Summary Judgment to Establish Plaintiffs' Standing should be GRANTED.

    1. The above captioned action was brought by plaintiffs pursuant to the Clean Air Act citizen suit enforcement action provisions against defendant

PacifiCorp seeking to "address significant and ongoing violations of air pollution permit emission limits at PacifiCorp's Jim Bridger Power Plant ("Jim Bridger") located in Sweetwater County, Wyoming." Complaint ¶ 1. The action is brought pursuant to the Clean Air Act, 42 U.S.C. § 7604(a)(1), and the operating permit for Jim Bridger. In their action, plaintiffs seek declaratory and injunctive relief, and imposition of civil penalties.

2. Plaintiffs include the Sierra Club, a national citizens organization dedicated to protecting natural resources, including clean air and water, and the Wyoming Outdoor Council ("WOC"), a nonprofit membership organization founded by Wyoming residents in 1967 to conserve the state's wildlife and protect its air, water and land by promoting sound natural resources policies. The action is brought on behalf of the adversely affected members of the Sierra Club and WOC. Complaint ¶¶7-8.

3. The complaint alleges that members of the Sierra Club and WOC reside in, work in, or regularly visit and use resources of the Red Desert, the airshed most immediately impacted by PacifiCorp's alleged violations of the Clean Air Act at Jim Bridger. Complaint ¶ 9. The complaint alleges that aesthetic, recreational, environmental, spiritual, economic and health-related interests of plaintiffs' members have been injured by PacifiCorp's illegal and excessive emissions of pollutants into the airshed of the Red Desert and Southern Wyoming. Id.

4.   The defendant, PacifiCorp, is a multi-state electric utility based in Portland, Oregon.  It is a wholly owned subsidiary of MidAmerican Energy Holdings company.  Complaint at ¶ 11.  PacifiCorp is authorized to do business in Wyoming and is the operator and majority owner of Jim Bridger.  PacifiCorp is the named permittee in WDEQ Operating Permits dated October 29, 2001 (No. 30-120-2), June 15, 2004 (No. 31-120-1), and September 6, 2005 (No. 3-1-120-2).  PacifiCorp is alleged to have overall responsibility of ensuring that pollutant emissions from Jim Bridger do not exceed established permit limits and it has authority to correct violations of air pollution permit limits at Jim Bridger.  Complaint at ¶¶11-12.

5.   The complaint addresses PacifiCorp's Title V Operating Permits for Jim Bridger.  The operating permits were issued by the Wyoming Department of Environmental Quality (WDEQ) and regulate the emission of air pollutants from Jim Bridger.  The complaint includes the following allegations:

> 34.  Pursuant to condition (F6)(a)(iii) in PacifiCorp's Operating Permits, the opacity of emissions from the stacks of Jim Bridger Units 1-3 is limited to 20 percent on a six-minute average, except for one two-minute period per hour in which opacity may not exceed 40 percent.
>
> 35.  Pursuant to condition (F6)(b)(iv) in PacifiCorp's Operating Permits, the opacity of emissions from the stack of Jim Bridger Unit 4 is limited to 20 percent on a six-minute average, except for one six-minute period per hour in which opacity may not exceed 27 percent.

36. In the air pollution context, percentage opacity is the degree to which the transmittance of light is reduced by air pollutants. A pollution plume of 20 percent opacity, for example, means that light passing through the plume is reduced by 20 percent. A pollution plume of 100 percent opacity is so dense that light is unable to pass through it.

37. The 20 percent opacity limit applicable to Jim Bridger Units 1-4 is an "emission standard or limitation" within the meaning of 42 U.S.C. § 7604(a)(1) and (f).

6. PacifiCorp has generally denied plaintiffs' allegations. In the motion considered in this Order, plaintiffs seek a partial summary judgment that plaintiffs, as representatives of their individual members, have standing to bring this action. Defendant disagrees that plaintiffs' submissions establish that they have standing. Defendant contends that the claims alleged by plaintiffs are for opacity violations, not pollution violations, and that the plaintiffs have failed to present undisputed facts showing that their alleged injuries are fairly traceable to opacity violations.

7. Plaintiffs have offered in support of their position affidavits of various individual members of the two plaintiff organizations:

(a) John Mionczynski is a resident of Atlantic City, Wyoming, and a member of WOC for at least the last five years. Since 1967, he has spent summers studying ethnobotany and ecology in the Red Desert. He regularly sees a pollution plume from Jim Bridger, which is often dirty pink in color and extends northeast as far as can be

seen on the southern and eastern horizon. He asserts the mountains are rarely visible due to the plume of pollution coming directly from Jim Bridger. The plume of pollution and the haze from the plume originating from the power plant has made it impossible to photograph a natural, unpolluted picture of the landscape of the Red Desert, impairs his aesthetic enjoyment and appreciation of wildlife and geologic features of the Red Desert, and he opines, among other things, that the scenic and recreational value of the Red Desert is devalued by the plume of pollution from the Jim Bridger plant. He avoids areas downwind of Jim Bridger.

(b) Mac Brewer is a part-time resident of Lander, Wyoming where he also owns a home. He is a Board Member of WOC and has for the past nine years explored, camped, and guided trips into the Red Desert. He asserts that on most days, the haze in the Red Desert is terrible to him, in part from Jim Bridger's off-white plume. The landscape is blurred to him and obscured by particulates. Pollution from Jim Bridger alters his view to the south, by the direct plume from the plant, and with a more general haze downwind as the plume disperses. He can see the pollution and haze from the plant because his views upwind are sharper and more distinct. He finds pollution

and haze distressing and it discourages him and his appreciation of the landscape.

(c) James Catlin lives in Salt Lake City, Utah, and has been a member of the Sierra Club since 1976.  His employment involves working on the Wild Utah Project, an ecoregional planning project involving the Red Desert in southwestern Wyoming.  He collects field data on the influence of human activities in the region on wildlife and wildlife habitat, including desert elk, antelope, wild horses, sage grouse, and other species.  He has visited the Red Desert on numerous occasions, spending several days at a time in the area.  He always notices the Jim Bridger smoke stacks.  He has seen stack emissions that originate from the Jim Bridger stacks form a brown layer of pollution in the sky which does not exist upwind of the stacks. He finds the pollution disturbing and depressing because it is in direct conflict with the natural beauty of the region.  His enjoyment of the area is impaired when pollution from the stacks spreads throughout the sky.

(d) Meredith Taylor lives in Dubois, Wyoming and has lived in northwest Wyoming since 1975.  She is a member of both the Sierra Club and WOC.  She frequently visits the Red Desert and southern

> Wyoming wilderness study areas to recreate, canoe, study pronghorn antelope and other wildlife. Over the past 15 years, she has seen smoke coming from Jim Bridger as a gray plume that spreads out through the sky. On an occasion while canoeing near Jim Bridger, emissions from the stacks blocked her view of the landscape, burned her eyes, and caused an unpleasant smell. She attempts to avoid that stretch of river because she does not want to be exposed to the emissions from the Jim Bridger plant. She has continued to observe a haze from the Jim Bridger plant. The pollution from the plant impairs her views of the Red Desert and is unpleasant. She is concerned that pollution could interfere with the outfitting business she and her husband operate because her customers will not experience crisp vistas and clear skies.

8. PacifiCorp offers the affidavit of its opacity expert, Richard McRanie, who opines that opacity is not equivalent to pollution. PacifiCorp contends that the plumes described by the individuals above would exist even when opacity levels are at or below permitted levels. PacifiCorp suggests that plaintiffs have provided no evidence to support an argument that their members are persons for whom the aesthetic and recreational values of the Red Desert will be or have been lessened by the alleged opacity violations. It also argues that plaintiffs provide no evidence

fairly tracing the pollution plumes to the opacity violations at issue. McRanie has also asserted that the opacity readings reflected in the Excess Emission Reports, which form the basis for the plaintiffs' allegations, are measurements of the light-blocking property of all emissions passing through the light beam of the continuous opacity monitoring systems ("COMS"), and that emissions blocking the light beam at any one time, therefore, could be water vapor or legally permissible levels of particulate matter. PacifiCorp contends that the Jim Bridger plant's particulate matter emissions were well within permitted limits at all times relevant to the suit.

9. The United States Supreme Court has discussed its Article III standing jurisprudence in Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 120 S.Ct. 693 (2000). It begins the standing discussion by outlining Article III's standing requirements:

> In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), we held that, to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple

Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Laidlaw contends first that FOE lacked standing from the outset even to seek injunctive relief, because the plaintiff organizations failed to show that any of their members had sustained or faced the threat of any "injury in fact" from Laidlaw's activities. In support of this contention Laidlaw points to the District Court's finding, made in the course of setting the penalty amount, that there had been "no demonstrated proof of harm to the environment" from Laidlaw's mercury discharge violations. 956 F. Supp., at 602; see also ibid. ("[T]he NPDES permit violations at issue in this citizen suit did not result in any health risk or environmental harm.").

The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter as part of the standing inquiry (as the dissent in essence does, post, at 713-714) is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit. Focusing properly on injury to the plaintiff, the District Court found that FOE had demonstrated sufficient injury to establish standing. App. in No. 97-1246(CA4), at 207-208 (Tr. of Hearing 39-40). For example, FOE member Kenneth Lee Curtis averred in affidavits that he lived a half-mile from Laidlaw's facility; that he occasionally drove over the North Tyger River, and that it looked and smelled polluted; and that he would like to fish, camp, swim, and picnic in and near the river between 3 and 15 miles downstream from the facility, as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges. Record, Doc. No. 71 (Exhs. 41, 42). Curtis reaffirmed these statements in extensive deposition testimony. For example, he testified that he would like to fish in the river at a specific spot he used as a boy, but that he would not do so now because of his concerns about Laidlaw's discharges. Ibid. (Exh. 43, at 52-53; Exh. 44, at 33).

Other members presented evidence to similar effect. CLEAN member Angela Patterson attested that she lived two miles from the

facility; that before Laidlaw operated the facility, she picnicked, walked, birdwatched, and waded in and along the North Tyger River because of the natural beauty of the area; that she no longer engaged in these activities in or near the river because she was concerned about harmful effects from discharged pollutants; and that she and her husband would like to purchase a home near the river but did not intend to do so, in part because of Laidlaw's discharges. Record, Doc. No. 21 (Exh. 10). CLEAN member Judy Pruitt averred that she lived one-quarter mile from Laidlaw's facility and would like to fish, hike, and picnic along the North Tyger River, but has refrained from those activities because of the discharges. Ibid. (Exh. 7). FOE member Linda Moore attested that she lived 20 miles from Roebuck, and would use the North Tyger River south of Roebuck and the land surrounding it for recreational purposes were she not concerned that the water contained harmful pollutants. Record, Doc. No. 71 (Exhs. 45, 46). In her deposition, Moore testified at length that she would hike, picnic, camp, swim, boat, and drive near or in the river were it not for her concerns about illegal discharges. Ibid. (Exh. 48, at 29, 36-37, 62-63, 72). CLEAN member Gail Lee attested that her home, which is near Laidlaw's facility, had a lower value than similar homes located farther from the facility, and that she believed the pollutant discharges accounted for some of the discrepancy. Record, Doc. No. 21 (Exh. 9). Sierra Club member Norman Sharp averred that he had canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe in the North Tyger River closer to Laidlaw's discharge point, but did not do so because he was concerned that the water contained harmful pollutants. Ibid. (Exh. 8).

These sworn statements, as the District Court determined, adequately documented injury in fact. We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity. Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). See also Defenders of Wildlife, 504 U.S., at 562-563, 112 S.Ct. 2130 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing.").

Our decision in Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), is not to the contrary. In that case an environmental organization assailed the Bureau of Land Management's "land withdrawal review program," a program covering millions of acres, alleging that the program illegally opened up public lands to mining activities. The defendants moved for summary judgment, challenging the plaintiff organization's standing to initiate the action under the Administrative Procedure Act, 5 U.S.C. § 702. We held that the plaintiff could not survive the summary judgment motion merely by offering "averments which state only that one of [the organization's] members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action." 497 U.S., at 889, 110 S.Ct. 3177.

In contrast, the affidavits and testimony presented by FOE in this case assert that Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests. These submissions present dispositively more than the mere "general averments" and "conclusory allegations" found inadequate in National Wildlife Federation. Id., at 888, 110 S.Ct. 3177. Nor can the affiants' conditional statements -- that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it -- be equated with the speculative "'some day' intentions" to visit endangered species halfway around the world that we held insufficient to show injury in fact in Defenders of Wildlife. 504 U.S., at 564, 112 S.Ct. 2130.

Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), relied on by the dissent, post, at 714, does not weigh against standing in this case. In Lyons, we held that a plaintiff lacked standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat from the policy. 461 U.S., at 107, n. 7, 103 S.Ct. 1660. In the footnote from Lyons cited by the dissent, we noted that "[t]he reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct," and that his "subjective apprehensions" that such a recurrence would even take

place were not enough to support standing. Id., at 108, n. 8, 103 S.Ct. 1660. Here, in contrast, it is undisputed that Laidlaw's unlawful conduct -- discharging pollutants in excess of permit limits -- was occurring at the time the complaint was filed. Under Lyons, then, the only "subjective" issue here is "[t]he reasonableness of [the] fear" that led the affiants to respond to that concededly ongoing conduct by refraining from use of the North Tyger River and surrounding areas. Unlike the dissent, post, at 714, we see nothing "improbable" about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms. The proposition is entirely reasonable, the District Court found it was true in this case, and that is enough for injury in fact.

Laidlaw argues next that even if FOE had standing to seek injunctive relief, it lacked standing to seek civil penalties. Here the asserted defect is not injury but redressability. Civil penalties offer no redress to private plaintiffs, Laidlaw argues, because they are paid to the Government, and therefore a citizen plaintiff can never have standing to seek them.

Laidlaw is right to insist that a plaintiff must demonstrate standing separately for each form of relief sought. See, e.g., Lyons, 461 U.S., at 109, 103 S.Ct. 1660 (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief); see also Lewis v. Casey, 518 U.S. 343, 358, n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[S]tanding is not dispensed in gross."). But it is wrong to maintain that citizen plaintiffs facing ongoing violations never have standing to seek civil penalties.

We have recognized on numerous occasions that "all civil penalties have some deterrent effect." Hudson v. United States, 522 U.S. 93, 102, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997); see also, e.g., Department of Revenue of Mont. v. Kurth Ranch, 511 U.S. 767, 778, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). More specifically, Congress has found that civil penalties in Clean Water Act cases do more than promote immediate compliance by limiting the defendant's economic

incentive to delay its attainment of permit limits; they also deter future violations. This congressional determination warrants judicial attention and respect. "The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties. ... [The district court may] seek to deter future violations by basing the penalty on its economic impact." Tull v. United States, 481 U.S. 412, 422-423, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description. To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.

The dissent argues that it is the availability rather than the imposition of civil penalties that deters any particular polluter from continuing to pollute. Post, at 718-719. This argument misses the mark in two ways. First, it overlooks the interdependence of the availability and the imposition; a threat has no deterrent value unless it is credible that it will be carried out. Second, it is reasonable for Congress to conclude that an actual award of civil penalties does in fact bring with it a significant quantum of deterrence over and above what is achieved by the mere prospect of such penalties. A would-be polluter may or may not be dissuaded by the existence of a remedy on the books, but a defendant once hit in its pocketbook will surely think twice before polluting again. [FN2 omitted]

Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-186, 120 S.Ct. 693, 703-707 (2000) (footnote 2 omitted).

10. The Court is persuaded that plaintiffs do have standing in this case. Defendant's argument that this is not a case about the discharge of pollutants

and is instead a case about opacity seems to miss the mark and unnecessarily obfuscates the nature of plaintiffs' claims. The individual affiants all complain about the plume(s) arising from the stacks at the Jim Bridger and how it affects their visual enjoyment and use of the land in the Red Desert. Their statements adequately document injury in fact when they "aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. at 183, 120 S.Ct. at 705, quoting Sierra Club v. Morton, 405 U.S. 727, 735, 91 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Their concerns about the effects of the emissions or plumes from the stacks at Jim Bridger, whether characterized for purposes of the instant motion only as pollution, emissions or particulates, directly affect the affiants' recreational, aesthetic, and economic interests.

11. The Court finds that the allegations in the complaint are sufficient to support a finding that plaintiffs have standing to bring this action, and that they are consistent with the Supreme Court's analysis in Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 120 S.Ct. 693. The Court declines to express any opinion as to the merits of the plaintiffs' allegations or defendant's responses thereto in this Order; separate motions for

summary judgment are pending on the issues raised by plaintiffs' allegations of violations of the Clean Air Act and the relevant permit opacity standards and will be addressed by separate order.

12. The Court finds that the plaintiffs' motion for partial summary judgment to establish standing should be granted for the reasons stated above.

Accordingly, it is therefore

**ORDERED** that the plaintiffs' Motion for Partial Summary Judgment to Establish Standing (Docket Entry 31) shall be, and is, **GRANTED.**

Dated this 24th day of August 2009.

_____
UNITED STATES DISTRICT JUDGE